May it please the Court, my name is Kathleen Kimball Windsor, and I represent the appellant Anthony Fuller in these proceedings. We spoke beforehand, and we decided that we'd place – unless the Court has a different preference – that we'd place the three sufficiency arguments first. So I'll argue for Mr. Fuller, and then Mr. Newman will argue second for Mr. Schlesinger. And we thought we'd divide our time evenly, but we're all going to throw 30 seconds or so to Mr. Schlesinger so he can have… My math isn't that good. It's five minutes each, does that sound right? If we're leaving seven, I guess we're each going to take four and a half minutes, the others three. Carry the one, that comes down to – okay. We'll put five minutes on the clock for Ms. Windsor. Okay, good. Hang on a second, let me – five minutes on the clock. Is that what you had in mind? Yes, perfect. Okay, hang on, just let Mr. Brown do his thing here. Good, you're up. Thank you. Just to refresh everyone's recollection, Mr. Fuller is the 19-year-old Mt. SAC college student who was on the basketball team. He was charged as a low-level runner, or drop, and his basketball teammate and roommate, Franklin Ragsdale, became involved in the scheme as a crew leader, which was sort of that mid-level in the scheme. And he was one of the defendants on which the jury initially deadlocked. The other two, Mr. Westbrooks, the jury acquitted, and Mr. Davis, this court reversed in an unpublished decision earlier this year, perhaps even last year. Let me ask you this to cut to the chase. Is it your argument that nobody proved that Fuller went into the bank to do these things? Yes. So that's – our first argument is just identity, that the government didn't prove that he was the guy who opened the account as opposed to Ragsdale. Someone came in with Fuller's ID, with Fuller's picture on it, and why couldn't a jury infer that the guy with Fuller's ID, with Fuller's picture, is probably Fuller, in the absence of any other evidence? That's exactly the question. I mean, we agree that there are these three accounts, they have his name on it, they have his driver's license number, and – He never reported his license stolen or – Well, I mean, he was – it was his roommate who was – and teammate – His roommate, who you're insinuating, but I mean, he's never reported a license stolen or anybody using his license, did he, or did he? No, I mean – no, and I mean, honestly, Your Honor, what we're focusing on is just what the government proved, and that is – I mean, I think we have a plausible way that his driver's license could have been used, but I mean, all we have is his name on this. There's not any other evidence of identity, and there's lots of ways to prove identity. I mean, in this day and age, people's identities are stolen all the time. Okay, I take your point. Did he ever report his license stolen? No, there's nothing in the record. Did he testify that his license was stolen? He did not – he did not testify at all, the – Okay, so I mean, why would we think it was stolen? Well, because – I mean, what we're saying is that the government has to prove that he opened this account. All the evidence is viewed in the light most favorable to the government. Absolutely, but – So going back to the original question Judge Silverman asked, why wouldn't – why isn't this sufficient? Well, all we have is his name on this account. We have – I know you keep saying that, but Judge Silverman's question was, why wouldn't – why isn't that Fuller's the guy who opened the account with Fuller's name on it? Well, because in this case, he is – his roommate, who admittedly is involved in this scheme, who's the one who transmitted all of the account information to the guy who was reporting it to Egypt, that guy looks pretty much just like my client does. They're both on the basketball team. They're both 6'5", African-American kids. They weigh exactly the same amount. And all of the – all we do know is that Ragsdale was the one who was there, who was involved, who pled guilty, who was the one who was texting the information. And all we have is – You're asking me – aren't you asking us to construe the evidence against the government? No. In favor of this verdict? That's – we're obliged to do that. Well, I mean, the question really is, is it enough to assume that it's someone's identity because their name is on the account? Well, it's a name and – I mean, the evidence, as I understand it, was that someone walked into the bank with Mr. Fuller's driver's license, has his photograph on it, and it would seem like it's a reasonable inference that it was Fuller in the absence of some reason to think it wasn't Fuller. Well – And the fact that he has a roommate that, you know, also plays basketball or – I mean, that doesn't really refute it. Well, I mean, all the time – I mean, I charged a computer on my visa card yesterday, except that I didn't charge a computer on my visa card yesterday. I mean, in this case – How do we know you didn't? I mean, because you said so, right? Right. Who says he didn't go into the bank? Who said it wasn't his ID? Someone told you? Well, he entered a not guilty plea and he went to trial, and the government has to prove that he was the guy. Well, it seems to me – well, I mean, we're beating a dead horse, but it seems to me the government's come forward with reason to think it was Fuller, and there's virtually nothing to refute it. Well, I mean, by entering a not guilty plea, he's saying – He's saying prove it, and they say, okay, guy with Fuller's address, Fuller's license, Fuller's picture – Well, it's – we actually don't know that his – what we do know is that his name was on it and his driver's license was on it. We also know – and we have the bank policy that they say they check ID, although we also have the bank policy that they say they always take a signature card, and they don't. They had that his gender was female. And no evidence that anybody was using his ID? Well, I mean, I don't know that he would have known to report his ID stolen. I mean, he – Come on. Ragsdale also used his phone. I mean, these were people who were close. Am I out of time? Yes, you are. Okay. Thanks, Ms. – Thank you. Thanks, Ms. Gunzer.  Yes, Your Honor. Good morning. Good morning, Your Honors. May it please the Court. Your Honor, my client, May Settle, is – at the time of the trial, was a 19-year-old young lady who had three children, was essentially uneducated, extremely unsophisticated, and got involved in this scheme. And she was a solely through the – through the contact with her older sister, who – Ario Lavodi, I'm not sure I'm pronouncing that name right, who had intimated to her – not intimated, but actually told her that what she was doing was okay, that she would not get in trouble if she did it. My client went ahead and opened the accounts really at the behest of her sister. She had no knowledge of – Let me ask you, do I understand correctly she used a different – an incorrect address and a false Social Security number to open these accounts? Well, Your Honor, actually she didn't use an incorrect address. She used an old address of hers. Not her address where she was – Not her current address. That's correct, Your Honor. And a false number? And a – I think one number was wrong on her – Well, it's either the right number or the wrong number. It doesn't – you know, we don't take off her widgets. That's correct, Your Honor, because she wasn't going to be personally using this account herself, and that she was opening this account at the – like I said, at the behest of her sister. Okay. And her sister was using it – had gotten her involved through the contacts with her cousins. Got it. Now, my question is, is she – she was convicted of both the overarching conspiracy count one and two counts of bank fraud. That's correct, Your Honor. Are the bank fraud counts being challenged here? To an extent, yes, Your Honor, in that only to the extent as to her knowledge of the fraud and that – to the extent that she did not intend to defraud the banks, that she did not know what was going on. Her sister had told her that – You've got to understand, Your Honor, this is an extremely – I can't emphasize that – extremely unsophisticated young lady who is a – for want of a better word, really is – comes from a clan. She's Samoan. She lives with her parents. They're three in a single house. At that time, they were an apartment. Before sentencing, they moved into a single house with her parents. Her sister and her sister's kids were there. Some cousins were there. See, I think you've got a valid point that maybe they didn't prove that she had sufficient knowledge of the overall conspiracy to send money back to Egypt and everything. I'm having a hard time justifying reversing a conviction for bank fraud. Well, she – but she used her own identification ID card, Your Honor. She did use a past address that she did – Yeah, we're talking about the false stuff. I understand, Your Honor. How do we – how do we get around the false stuff? Well, I think there was – because she wasn't going to be using these accounts herself, Your Honor, that she fudged on the – on the – on the address, although it should be said, Your Honor – She thought somebody else was going to be using it. She wasn't really – didn't know what was going to happen, Your Honor. I know you're rolling your eyes, Your Honor, but I can't emphasize enough. This lady is so unsophisticated. I don't want to say she was – you know, you're completely uneducated, but about as close to being uneducated as you can get. I mean, you're making a pretty good mitigation case, but she got only one day in jail, as I understand it. Yes, and that's because Judge Haddam also believed that she didn't have any clue as to the scope of the conspiracy, had no knowledge of Egyptian contact. The fact is, when she came to the bank after opening the account and her sister was in the car with her cousin's husband, Joshua, and this other recruiter, she never had contact with the recruiter. She handed her phone over to her sister, who gave it to Joshua, her cousin, who then gave it to the recruiter, who then – evidently, his phone had died and texted some – the bank information to someone else. According to the testimony from Ms. Legobi, my client had no contact with that individual or even with her cousin while they were in the car. The fact is, Ms. Legobi said that my client was certainly chatting away with her sister while they were in the car. That's to tell you, Your Honor, it's just the lack of sophistication, the lack of ability really to intend to defraud the bank. She had never had any kind of prior convictions. She was a 19-year-old. And – I see you're – I see I'm very close to time. We're ready to pass the baton to Mr. Rome. Yes, Your Honor.  Good morning. Richard Rome for Defendant DuBose. Good morning. DuBose was convicted of the conspiracy only, and I think for the same reason that this Court reversed the Davis case about a year and a half ago or so, that you should reverse DuBose and probably the other defendants with respect to the sufficiency of the evidence. Davis gave his proper Social Security number and his proper address. Right, but I think – He didn't. I beg your pardon. That might be true. I think it's irrelevant to the case because when you look at – What do you mean might be true? It was true. If it's true, it's irrelevant to our case. Why is that? Because when you look at the legal test that the Court went through on the Tremont Davis case, DuBose had one chance encounter on a day in – the year before, in 2008, one small occurrence. Now, do we label her an international bank fraud conspirator for the rest of her life because of this small transaction? The cases that were cited in Tremont Davis, and particularly the Umagat case, where it talks about having to be aware of the scope of the overall conspiracy, and I think that's the key. And in this case, there's zero evidence, other than – granted, I'll say all the facts 100% and won't argue what was submitted to the bank. Does that make her liable? And I don't think so. Otherwise, what's the purpose of the Umagat case and those other cases? Didn't she give an incredible explanation post-arrest? Well, no. No, a man just – a man came along with a Bank of America account and said, could I help him out? Because if that's not credible, doesn't that indicate that she had something other than an innocent motive in opening the account? Well, I think that ties in with our second argument, which I wasn't necessarily going to go along with, with the exclusion of the evidence, where she had, on the 106, Rule 106, where she actually had known this guy wasn't a totally random encounter. She had seen him around the apartment building. When he approached her about opening this account, she did. This sounds like bank fraud to me. Your client was convicted of conspiracy. Only a conspiracy. She was not convicted of any bank fraud. What's the strongest evidence of connection to a conspiracy? Pardon me? What's the strongest evidence of connection to a conspiracy against your client? I think it's – I don't think there's any strong evidence, other than that she opened – What did the government argue at trial? Opened the account. Opened the account. Submitted a false social. The last three digits were reversed. And submitted a false address. That was basically the evidence. We can't dispute that. There were some discrepancies in a statement that she gave to the police, and then – but she gave that like a year and a half after the bank robbery. I'm sorry, not after the bank robbery. After the bank event. So if there was a discrepancy, those could be explained away. But their strongest evidence is what I've said, and we'll acknowledge it, but I don't think it meets the legal test. If they had done bank fraud, or maybe submitting false documents to a bank, or something else, then we're talking about a different issue. But if we're just talking about the conspiracy, and we look at the Tremont Davis case and the law that this court basically laid out for us, very clear, there's really – other than it's true Davis didn't have any – he was clean, I'll say that. But I don't know that that changes what the result is on the conspiracy charge. Clean meaning Davis used correct information. Yes. Is that what you mean? Yes, that is what I meant. Okay. He submitted – and I understand that. But I don't think that in the end that that really makes a difference on the conspiracy charge. Other than that, if the court has any – I would defer a minute to my co-counsel. He's got like three issues. If the court has any further questions. If not – Nothing. Thank you. Thank you, Mr. Rome. Thank you very much. Okay. Mr. Klesinger, you're up. Good morning. Good morning. May it please the Court, my name is David Klesinger. I represent the appellant Cole Mercy. With the Court's indulgence, I'd like to first begin by discussing the duress issue and then move on to what I would consider the hybrid issue of substitution of counsel and the District Court's failure to give Ms. Mercy a continuance so that she could retain Mr. Mark Carlin as her counsel instead of her appointed CJA counsel, Michael Tremont. And, of course, I'd be glad to answer questions regarding any subject which we do address. Now, regarding duress, the District Court erred as a matter of law both during the early stages of the trial and regarding Ms. Mercy's Rule 33 motion post-trial in determining that Ms. Mercy had not deduced a prima facie case regarding each of the three prongs of the duress defense. The most egregious of those errors was the District Court's determining that Ms. Mercy did not have a well-granted fear that her abusive ex-boyfriend, Kenneth Lucas, the mastermind of this scheme, would cause her harm. And she proffered, among other things, four instances in which Mr. Lucas had actually physically abused her. When did these events take place? The events took place, Your Honor, in September of 2008. She lodged a complaint with the Oceanside. Okay. Wasn't she already in the crime as early as February of 2008? That's what the indictment alleges, Your Honor. She was found guilty of, and that's what they proved, isn't it? Didn't she open the drop accounts on February 15, 2008? We acknowledge, Your Honor, that that is the evidence. Okay. Well, if that precedes the abuse, how does your duress defense fly? Because our theory, Your Honor, is that the abuse was basically replete throughout this relationship. It basically permeated the relationship such that there really isn't an identifiable date in these proffers as to when the abuse began until when it stopped. Indeed. Well, I mean, if we take the date you just gave us, was it August, did you say? September. September. September was the... She's doing criminal acts in March and in April. I don't get how that works. Well, if you want to limit it even more so, Your Honor, there were specific instances of physical abuse in December of 2008, which were specifically charged in the indictment. There were two counts of bank fraud, counts 34 and 35, and approximately 10 overt acts that occurred during the December 7th and December 9th time period in which Ms. Mercy Proffer, that Mr. Lucas had assaulted her with a baseball bat, falsely imprisoned her in his bedroom, and took her car. So at a bare minimum, Your Honor, we would submit that those, her convictions on those counts, and possibly the conspiracy count as well, because we don't know on which overt acts the jury relied to convict Ms. Mercy on count one. At a bare minimum, that aspect of the conviction should be reversed. More broadly, as I've argued, this, there was no identifiable time in the proffers that Ms. Mercy made as to when this abuse started. Is there any connection between the abuse you've just described and the scheme? Would I just refer to, Your Honor, regarding the bank fraud counts? The baseball bat, for example. I mean, was there, was he, was there any testimony that this incident was other than just conventional domestic violence or was it somehow related to the scheme? Well, in her proffer regarding that incident, she did say that Mr. Lucas had contacted her after he took her car to go to court and told her that she needed to complete the acts that he had instructed her to complete. So there's a clear inference that Ms. Mercy, at the very least regarding those acts, had a reasonable, well-grounded fear and an imminent one that Mr. Lucas would retaliate against her if she did not carry out his wishes. And because of the nature of that act, including the false imprisonment and her having been viciously assaulted with a baseball bat, she therefore, at least at a bare minimum regarding that, those operative events, she didn't have a reasonable opportunity to escape at that point. You know, you're running out of time, so I know you wanted to mention the continuance and change of counsel issue. Certainly, Your Honor. I would like to reserve some time for rebuttal as well, but if the Court would just say what you want to say about the continuance and it will give you a minute. Certainly, Your Honor. At a bare minimum, I think if you evaluate this under the framework that the District Court was not willing to allow a continuance such that Mr. Carlin could substitute in and absorb the facts of this very complicated case, at a bare minimum, the District Court would be at its discretion by not permitting Ms. Mercy to get a continuance for that purpose. Even though this case had been pending a long time and the motion was made eight days beforehand? We acknowledge that, Your Honor, but Ms. Mercy, as she mentioned during the so-called Marsden closed court hearing on February 11th, 2011, mentioned that her parents had not made resources available to her to retain Mr. Carlin until February 1st of 2011. Was there ever representation that substitute counsel could be ready in less than a year? I think she asked for a year-long continuance. Mr. Carlin had not made that representation, Your Honor. We submit that the District Court erred in not trying to push Mr. Carlin on whether he could have been ready earlier than one year. Otherwise, all of the other factors in this case, in the four-pronged Flint analysis, strongly weigh in Ms. Mercy's favor. She was going to benefit from the continuance by allowing her to have her retained counsel of choice. She was prejudiced under the Sixth Amendment by not having retained counsel of her choice. And there was only going to be minimal inconvenience to the District Court, the witnesses who would have testified. So if there are no further questions, I'd be glad to take them. Judge Breyer. Yes. The Court went through the four Flint factors as to whether the continuance should be granted. Which or perhaps all, which of those factors do you think were found against Ms. Mercy and which constituted an abuse of discretion? I think the District Court basically found against Ms. Mercy on all four factors. But she, the District Judge particularly emphasized the timeliness of the motion. And as I just explained in response to Judge Silberman's questions, there were extenuating circumstances that led her to make the motion to substitute eight days before trial commenced. And do you think that there was no basis in the record from which inferences could be drawn to sustain the finding of the Court as to timeliness? Not based on Ms. Mercy's representation, Your Honor. Well, but isn't her credibility on the line under representation? I mean, at that point, the District Court didn't have any basis for determining whether Ms. Mercy were credible or not regarding anything. The late motion is by itself reason therefore, isn't it? And we acknowledge that there is generally a presumption against a late filed motion. However, this Court has ruled repeatedly in different contexts that it is not per se a grounds for denying a continuance motion. Thank you. Thank you. Good morning. Good morning. May it please the Court. Ronald Chang for the United States. If I may, I would like to address the sufficiency issues first before addressing Defendant Mercy's issues regarding duress and substitution and continuance. I do want to point out that the indictment charged that all the defendants were engaged in a consensual case. We acknowledge that we did not prove that these runner defendants had knowledge of the Egyptian connection or the exact manner in which the money was put into the accounts. But we believe that under this indictment,    that a defendant engaged in the conspiracy does not need to know every detail that's involved in a conspiracy. By the nature of that, this is more than a detail. This was the overall grand plan. The plan was to get money into an account. The overall structure of the conspiracy was that this was a lowball scheme. And Defendant Lucas had gotten in touch with the defendants or the co-conspirators in Egypt who knew how to get the money out of victim accounts at Bank of America and Wells Fargo. The problem was there are no branches in Egypt, so the fishers in Egypt had Mr. Lucas arranged to get so-called runner accounts locally. The large number of runners who were engaged proceeded to set up accounts or, in a small percentage, their own accounts, to obtain small amounts of money, $1,000, the most mis-settled $3,000 per account. And that was the end of their involvement. If they wanted to get involved again, set up another account. But very few did that on a multiple scale. Was the compensation to the account openers always 50 percent? It was. It depended. Sometimes it was that. Sometimes it was less. Mr. Lucas had sent a third over to Egypt. It was divided any number of ways. But it would stand to reason, and I think it was proven at Mr. Lucas' sentencing, that he got a substantial share. The runners got a lesser amount. And I believe Mr. Davis had even said, well, getting half, that was a pretty good way to make some money for a day of my time. What's the strongest evidence of connection to the conspiracy for Settle and DuBose? Settle and DuBose would be their setting up the accounts initially. And we would base that actually on Judge Bozon's comments in Grass where she said, really the word slight connection is sort of a misnomer. Slight activity is really what should be said. So one act alone would be sufficient to connect those defendants with the conspiracy. Now, with Ms. Settle. Well, but I wasn't asking about overt acts. I'm really asking about the other point that I think Judge Silverman was getting to. In terms of their knowledge. They don't have to know every detail. This isn't every detail. I'm looking for any detail. What did they know? They knew. Everything must be fishy, no pun intended, because they're setting up an account and they're getting a bunch of money. You know, pretty good, as you said, pretty good pay for a day's work for just setting up the account. But what did they know about the plan or scheme? Well, what the evidence shows is that they knew that none of this should get back to them. So it was important to set up essentially a fraudulent account. So false Social Security, false address. The account was only used once. It was only used solely for purpose of the conspiracy. And then as far. Did you show that they knew that it would only be used once? That was what the evidence showed from the bank account statements. They got the money. They got the bank. You have the bank fraud. And they pulled the money out. But I'm not asking what the evidence showed happened, in fact, that the account was just used once. I'm asking what did you show about what they knew? And that goes to how the money came out. They knew they had to be on scene because once they transmitted the information as to the account, the transfer was going to happen very quickly. And that's borne out in the case of Ms. Settle where it happened on the same day. And she knew that in advance? She, well, again, it's the testimony of Ms. Ligovi who said that the arrangement was we would set up the account. We would pass the information to Joshua. Joshua would contact somebody else. And then we would be driven somewhere else to pick up the money. And that's what happened. Certainly that's what happened in the case of Mr. Fuller on two occasions. With Ms. Settle, I believe there was a lag of two days. And with Mr. Bose, there was a lag of two days. So what was apparent to the drop was that there are other people that are going to be involved, and it's because of those other people that the money is going to appear in my account. And I'll be able to go in, and I need to go in fast and take it out. Otherwise, you have what happened in the case of Mr. Fuller's third account. The transfer was reversed out, and there was nothing that could be pulled out. That's also shown because we played tapes of Mr. Lucas and Ms. Mosey's involvement with Drop Weems. I realize it's another person, but it's consistent with the scheme. Mr. Weems and his cell coordinator decided to take a break. Mr. Lucas called and said, well, Eddie, where are you? Oh, the drop has gone home. Mr. Lucas was furious with them and said, you've got to be there because the transfer is going to take place. The case law of this court shows in cases like Treadwell that the scheme itself can show the requisite mental state because of the structure. And the structure of this case shows that each drop would know that it was due to the efforts of others, that money would come into the account, that they needed to go in as fast as possible and pull it out, and moreover, this couldn't come back to them. That's why it was necessary to set up a fake account with a false Social Security number, with a false address, and in the case of Ms. Settle, as was demonstrated, a false place of employment. Her sister testified that Hoodie Baskets was not where she worked or the other place that she put down for her other account. Mr. Fuller had three different places of employment, provided three different false Social Security addresses, but they all were stuck because they had to provide their driver's license. There was testimony from the bank rep that that had to be done. There were inconsistencies, but not as to the requirement to show primary identification that had a photograph and the name of the individual. Let me ask you this. Did you prove that Fuller, Settle, and DuBose had any more knowledge of this scheme than Davis did? We believe the evidence overlaps really both as regard to the mental state as well as the actual involvement. So from our view, we believe that it did simply because there was more evidence as to each of them. With Mr. Fuller, you have three sets of accounts. You have the evidence that there were other people who were present. With Ms. DuBose, you have a false statement, which under this Court's case law, in and of itself, is not enough. In combination with other evidence, it can be used to show the requisite mental state. False statement, the Social Security number? Or what false statement are you referring to? I'm talking about Ms. DuBose's post-arrest statement where she gave false statements as to where she was living and where the branch was. And the import of that, as we argued to the jury, was she wanted to convince the agent that, well, this was just something happenstance. This might be somebody I'd seen around the complex, but that day, I just happened to be in the right place at the right time. You've convinced me she's committed a bank fraud. What I don't understand is how you tie her to an international conspiracy. Well, again, we – And I'm not sure what knowledge these three people had that – I'm talking about knowledge, not other things. How do you distinguish their knowledge from Davis' knowledge? Our court has held that Davis didn't have enough knowledge. Well, I think it goes to the fact that Davis, first of all, didn't provide any false information, and Ms. DuBose did. So Ms. DuBose – Okay, but I'm not talking about that, because you've got the bank fraud counts against Fuller and Settle, for example. But whether she provided false information or didn't provide false information, how do we know she just didn't commit mere bank fraud rather than also conspiracy? Well, the bank fraud, in a way – well, the bank fraud is really, in many respects, the same as the conspiracy given the objects that are charged. But putting that point aside – I mean, to me, it's not inconceivable we could affirm Fuller and Settle's bank fraud convictions and reverse the conspiracy convictions. That wouldn't be inconceivable at all. I appreciate the court's comment on that. But what I believe is the evidence that goes to the falsity in her application and the falsity in her statements tend to show that she knew that she was involved in a scheme to get money fraudulently. And it's not just the bank fraud, any bank fraud that she could have been charged with in Nevada herself, but it also goes to the conspiracy, a conspiracy that does not necessarily require her to have knowledge of the fact that there are fishers in Egypt or that there is Mr. Lucas and all these various levels. She doesn't have to know the overall object of the conspiracy? No, no. She doesn't have to know all the details of the conspiracy. Details, I grant you. She doesn't have to know the overall object of the conspiracy? The overall object was to defraud in violation of wire fraud and bank fraud. To steal money from people's bank accounts by this phishing operation? Not by the phishing operation. It was to commit bank fraud through some manner. And that is what the object of the conspiracy was. It was simply the object to commit a violation of 1343 and 1344-1. This is page 6 of the indictment in Ms. Settle's excerpt. I apologize, I only have this one copy. But at page 6, the objects of the conspiracy are simply that. As far as the manner and means, I grant you that Egypt does come up as a manner and means with respect to Mr. Lucas, Ms. Mosey, Mr. Clark, and some of the others who were involved, and Ms. Zee, because they had direct dealings with those individuals. But the fact that the runners are simply involved on a one-time basis is still enough. This slight activity is still enough under Brasso and under this Court's case law to tie these defendants sufficiently to the conspiracy. How is there more evidence of conspiracy in Settle's case than there is in Davis? I think I heard your answer as to DuBose, but I didn't hear it as to DuBose. In Settle, you have a description as to how the, if you will, the transactions went down that very day. Ms. Ligovi gave a description step by step that they were taken by Mr. Sanders. They went to the bank. They were told to open up the account. When they got the information, they passed it to Sanders so that he could pass it on to somebody else, the inference being that that information was important in terms of getting the transfer made. So again, rather than what you've just told me is the evidence of what happened that day, my question is was there evidence that Settle knew all of that? Well, again, I hate to come back to the same point, but what happened does bear on what they knew. So is the answer to my question yes or no? Well, if you're telling me put all that aside, Mr. Chang, do you have any other information? I don't. I don't. I'm not telling you anything. I'm asking you a question. And my question is did you have evidence in the record, sir, that Settle knew what you just told me? All I have, I don't. We did not ask Ms. Ligovi to speculate as to the mental state of Ms. Settle. We didn't have any evidence that Ms. Settle told Ms. Ligovi, I know that there is this scheme and that these things are involved. What we tried to present to the court and the jury was that there were these acts that Ms. Settle did that were step by step the same as Ms. Ligovi that would indicate to her that she knew as she was involved in the scheme just as Ms. Ligovi testified, that she herself knew that she was involved in the scheme. Okay. And the acts that Ms. Settle took that you're relying on are that she opened the account and? And she opened the account. She provided false information. In doing so, she had the information transmitted to the intermediary. The intermediary called somebody else within days in the case of the first account or on the same day she then went to make a withdrawal or attempt to make the withdrawal, and she did this on two occasions. And so these acts would indicate to her that she had the requisite mental state, that she was engaged in the conspiracy, and that her object was the same as that as the other defendants all the way up from Mr. Lucas all the way down to drops such as herself, DuBose, Weems, Fuller, and the other defendants who were charged and convicted. May I ask you this? Sometimes we look at these things so academically, lose sight of the forest for the trees. Talking about Fuller and Settle now, they both have bank fraud convictions and a conspiracy conviction. Yes, sir. Fuller's sentence was one day in jail time served. Settle's was the same thing. If the conspiracy convictions were set aside but the bank fraud convictions allowed to stand, would there be any practical effect here? I am not as up to speed on this issue. I believe there might be some impact on the term of supervised release. The district court could have the discretion to revisit that in light of any remand. Was there supervised release imposed? Yes, there was. I think it was a three-year term because of the bank fraud conviction. I think that at a minimum would require a three-year term. I'm just thinking out loud. Would we have to remand it for resentencing, or could we just say make a paperwork entry to scratch out count one? Well, I would strictly be speaking off the top of my head. I think there really is no practical difference. I'm not going to throw you a curveball. I'm just trying to noodle this out. I think you know what answer I would like to give. I'm just afraid I don't have the legal authority to cite to you. So I just can't say off the top of my head. Gotcha. That's a fair answer. Thank you. If I may, in the remaining time, I did want to address the points of Ms. Mersey. I think on the duress claim, we do stand by our position on the brief. The most that the defendant can say is that with regard to the December 8th baseball bat and locking in the house episode and the January gun to the head episode, I don't mean to make light of this, I'm just trying to paraphrase, that there is a connection to the crime because there was an allegation by Ms. Mersey that you better do this, you better do what I tell you or else, essentially. That is Ms. Mersey's allegation. On its face, that would seem to present at least a well-founded fear. We would submit that there are issues, though, as to escape and to immediacy, because before those dates, Ms. Mersey had made a report to the Oceanside Police Department and we had represented to the court that there was nothing in that police report that said, I am being threatened by my boyfriend and he is making me do these things with regard to a fraud and I can't get out of it because of his threats. We represented that was not the case. There was no rebuttal by the defense on that. There was a subsequent report that she made in April of 2009, again, no allegation that there was any connection to the scheme. So in terms of immediacy and in terms of opportunity to escape, we would submit that Defendant Mersey did not make her prima facie showing. As far as the entirety of the relationship, it obviously is troubling, the nature of this relationship that went on for a year before Ms. Mersey broke it off. But the fact of the matter is, is that from February through May, Ms. Mersey was involved in setting up fake accounts in her name, pulling out money, sending Western Union wires over to Egypt in her own name in substantial sums, and that's before you get to any of the alleged conduct that the defense adverts to in terms of the four episodes, which I gather begins with the September report to the Oceanside Police Department. This is similar to that seen in other cases, like Atoncio, where there was a contract put out on the defendant's life. There was a gunshot fired through a home, and yet this Court found that, again, immediacy and opportunity to escape was not satisfied. Why shouldn't she have been allowed to introduce that evidence just as to the accounts that were temporally so closely related to the baseball incident, baseball bat incident? Again, it goes to the immediacy, and it goes to the opportunity to escape. You can certainly say, and I don't believe it was argued as to those, it was really sort of everything as a whole, but even accepting that it was as to these individual accounts, she still did not make her finding as to opportunity to escape, and that's especially so not just given the police reports. She was online. She was on her cell phone. The day after, or several days after the December 8th episode, there is a taped call between her and Lucas. She's at home. She's folding clothes. She tells him, he asks her, can you help me with such and such? She says, well, I can't this afternoon. I've got to go out to San Bernardino. So it shows that she is certainly not in the position of a prisoner, if you will, being compelled to do these acts. There was some reliance on Johnson. I would like to address that for just a moment. Johnson was a sentencing case dealing with imperfect duress. It did touch on battered women's syndrome, but what that court pointed out was even if there were to be some kind of defense premised on that, there has to be some kind of an expert report. There was none of that proffered in this case under seal or publicly filed or otherwise. Moreover, even Johnson discusses a defendant named Breck, who was under psychological coercion from the defendant in that case, and also expressed fear by the defendant Breck that her mother would be killed if the defendant found out that the mother had informed on her. And yet the panel said the district court properly denied the duress defense. It did go on to address imperfect duress in the context of the guidelines sentence, but that is notable in that instance. With regard to the substitution and the continuance issues, we believe the court acted well within its discretion. It conducted a lengthy in-camera hearing, hearing both Ms. Mersey as well as Mr. Tremin. The court also had the benefit of knowing that there was going to be a five-week estimated trial, and, in fact, it was five weeks. There were numerous witnesses. There would have been substantial overlap. Even if the drops were left over, we still would have had to play the tapes from Mr. Lucas to show how the scheme worked along the lines of what I tried to argue earlier with regard to sufficiency, to simply put in the isolated transactions would not have been enough. So the court acted within its discretion eight days before trial in determining that it could not continue the case and could not substitute counsel, especially when trial had been continued for well over a year. Unless there are further questions, I would submit on that. Roberts. Thank you, Mr. Chain. Ms. Windsor, do you want to take 30 seconds for rebuttal? Thank you, Your Honor. I did just want to clarify that Mr. Fuller also has the same sufficiency argument as Ms. Settle and Ms. DeBose on the conspiracy and substantive bank fraud counts. I also just wanted to point out that in the Davis case, Davis gave a pretty weird statement, an exculpatory statement that the jury rejected, obviously. So even though Davis is a clean case in that he gave correct information, he also did give this somewhat absurd exculpatory statement. And my client did not. There's no post-duress statement. My client has his correct name, his correct date of birth, his correct driver's license, false social security number, and false address. If we were to conclude that the wire and bank fraud conspiracy count one can't stand but the other two counts can, do we need to send it back for resensing or can we just send it back with directions to delete count one? I don't think it would make any difference. And for these teenagers who have felony convictions, I think, I mean, really the bottom line is, I mean, that's what's the truth is that what concerns them is having a felony conviction. No remand or no resentencing is needed. I mean, I don't think, I mean, I think most of our clients are almost done with supervised release, in fact. So, in fact, may already be done. So the only other thing I would just say is that specific intent still has to be proved on those bank fraud counts. And I think it's a very similar issue. You know, did the government prove that they knew that this was bank fraud, that they specifically had the specific intent to defraud the banks? Thank you. Mr. Newman for Ms. Settle. Thank you, Your Honor. Just very briefly, Your Honor, a couple points. One is, at Settle excerpt of record, page 504 in the judgment commitment order, Judge Hatter had found that Ms. Settle had gotten paid for this, all her, quote, unquote, work, in this case, $200. And that's why he ordered restitution in the amount of $200 to Bank America. So in this whole sophisticated scheme, all this international intrigue, she got paid $200. Same question I asked of Ms. Windsor. If we were to conclude that the conspiracy count can't stand but the bank fraud counts can, do we need to send it back for resentencing or just tell Judge Hatter to delete count one? I don't believe it makes any difference, Your Honor. Ms. Settle is going to be off supervised release in April of this coming year, in 2015. So by the time filing and spreading and everything else happens, she's going to be off supervised release. So it really doesn't make any difference. The only other thing I wanted to bring up, Your Honor, if Your Honor were interested in what happened inside the vehicle, I believe in the excerpt of record, page, Settle excerpt of record, page 302, sort of goes into Ms. LaGuardia's explanation as to what went on in the vehicle when Ms. Settle came into the vehicle after going into the bank. Thank you. No further questions, Your Honor. Thank you. Thank you, Mr. Newman. Mr. Rome? Or Ms. DuBose? I really don't have anything to add to what was stated. The only thing is if there was a reversal, I would have to, it might affect some fine that was issued and arrested. There might be some technical issue that would arise. I know there was a three-year, I believe, supervised release. I don't know when it ended. Your pal is talking to you here. I think it might affect the $100 special assessment because you get that per count. So they might take $200 off. Well, Ms. DuBose is in a different boat. She only has the one conviction. That's correct. Okay. Thank you. Thank you. Mr. Schlesinger? Very briefly, Your Honor, regarding the operative events in December of 2008, I think Mr. Ching makes a quality jury argument regarding whether Ms. Mercy had a reasonable opportunity to escape. But fundamentally, this Court is only assessing de novo whether Ms. Mercy proffered a prima facie case of duress. So I submit that her evidentiary proffer is more than sufficient for it to go to a jury, at the very least on counts 34 and 35. Opposing counsel said there was never a request to limit it or that the evidence should only come in as to those, perhaps the limiting instruction as to those specific counts. Is that right? We acknowledge, Your Honor, that Mr. Tremmen did not make such a request. And again, this goes to the repeated problems that Ms. Mercy had with Mr. Tremmen, including Mr. Tremmen's somewhat strange decision to, as Ms. Mercy's sentencing counsel, Mark Geragos, and the district judge, Judge Hatter, concluded, in which Ms. Mercy testified and Mr. Tremmen did not make any attempt to withdraw, even though the testimony contradicted proffers she had made to the government. So we would submit that denying the continuance not only prejudiced her Sixth Amendment right to retain counsel, but also created very tangible prejudice in terms of how this case was tried. If there are no further questions. Thanks to all counsel. Mr. King, thank you. The case just argued is submitted and will stand in recess for today.
judges: Silverman, Bea, Christen